Okay, our last case this morning is number 16-1521, America's Collectibles Network v. The Jewelry Channel. Mr. Jones. Thank you, Your Honor, and may it please the Court. I hate starting off oral arguments this way, but I need to make an apology first. There is a mistake in our brief that I didn't find until I was prepared for the argument. It's page 17, the middle paragraph in the brief, under section C. Every time we say ACN, it should really be The Jewelry Channel, and every time we say The Jewelry Channel, it should really be ACN. But I think it's fairly clear that it's an obvious mistake. So why isn't this an abstract idea, using preliminary indicators to adjust the amount being sold? I mean, like, you read in the newspaper right now that OPEC does that. They look at preliminary indicators, they decide how much oil to sell, because this is going to affect the price. And why isn't that sort of a common thing that's been done for years, decades, centuries perhaps? And what's involved here is applying that in the context of a reverse auction. Yes, Your Honor, and that's exactly the point. It's not conventional. It's never been done. It's unique in the context of a reverse auction. We're not saying that these components, these preliminary indicators, never existed. But what we're saying is that the inventive concept here is the way that these— So you're saying this well-established method of dynamic pricing is patentable because for the first time they're applying it in reverse auctions? No, Your Honor. We're saying that it's unique and it's patent eligible and it's an inventive concept because it's applied in reverse auctions solely confined to the TV and internet. And that's the key. Just like this court's previous cases, and I think it's the DDR Holdings case, which found an internet-centric solution to a problem, that's exactly what this is here, Your Honor. It's a TV and internet-centric solution, an inventive concept that's confined to reverse auctions and a particular type of reverse auction that only is conducted over the internet and over television. And one of the things that I would ask that Your Honors do, one of the most important things here is to understand what a reverse auction is and particularly to understand what this reverse auction that's claimed in the 211 patent is. And I would direct Your Honor's attention, if you want to get a really good background on this and see one in action, go to the website www.shoplc.com and click on the Watch Live TV link that's on that page and you will see this type of reverse auction, which our expert witness deemed to be, he calls it a multiple same item reverse auction. That's an extremely narrow field, an extremely narrow and extremely unique type of reverse auction. And it's our belief that there's only a handful of those auctions that exist in the world, at least over the TV and internet, as required in the claims. And it's the auctions that do exist that use this type of reverse auction, this MSIRA auction, are confined generally to the sale of jewelry. And it's why we're here today. And Your Honors, the abstract idea, Judge Dyke, you went immediately to accepting, I believe, or at least stating the question as, why is the use of preliminary indicators not the abstract idea? And the reason why it's not is because that's not the abstract idea. This court's cases, Bastrom, rapid litigation management, the CLS Bank case, which came out before Alice was decided, and another one, Electric Power Group, as well as a recent case that came out after our briefs were filed, the Affinity Labs versus Direct TV case, they all say that the abstract idea that you have to identify first in this Section 101 analysis is the basic underlying concept of the patent. It's not what's claimed. If you look at Alice, what the Supreme Court said is that the abstract idea was the intermediated settlement. That's from the preamble of the Alice patent. This court has said in Bastrom, in Electric Power Group, in rapid litigation management, that you've identified the abstract idea, and every single time, the statement of what the abstract idea is comes directly out of the preamble and the claim. Can I just ask this, and this is, I guess, maybe more of a doctrinal question. I'm not sure we've actually said, and part of my question is, I'm not sure it actually makes any sense to say that we always have to identify a particular abstract idea in Step 1 in order to move to Step 2. It seems to me that there are large categories of activities that constitute, that fall under the abstract idea category. Selecting information, manipulating information, entering into legal contracts, and you can define those in any given case at an infinite variety of levels of generality. And I'm not sure what the point is of spending a lot of energy defining the proper level of generality for Step 1. The question is always, what is the affirmative set of steps or set of physical structures or set of something that is outside that category? It's a search for something affirmative, so that it doesn't really advance the inquiry to say, well, the abstract idea is something extremely general, and now let's look at all the details in the claim where all of those details are themselves abstract. You haven't done anything. Why is this not a case in which everything going on here is formation of terms of contracts, sales offers, based on information you think is relevant? Full stop. Every bit of that is abstract. And, Your Honor, you must be referring to an analogy with the OIP case, which the board used and which your channel does here, because that's the kind of cost issue, the contract issue that's being raised. This is not a contract formation issue. You're deciding how many units to offer and at what price? No, Your Honor. Ultimately, that is what is being decided, but the effect is not the formation of the contract. The effect is minimizing the amount of time, the amount of Internet time, the amount of TV time that it takes that the auctioneer has to purchase before they can move on to selling the next item, determining the amount of time it takes to sell all of the lot, all the quantity of the product that's being sold. And that's why I want to take you to what this type of auction is and what it does. Let's say you start out with 100 necklaces for sale. And the auctioneer will set a bidding price, a starting price of, let's say, $100 each. And you get 10 people either clicking in through the Internet or calling in on the telephone line who say, I'll buy at $100. I'll buy at $100. And you get 10 of them. Well, the sale is not completed until that person's credit card is charged. And this is not like a formal forward auction where people walk in, they give the credit card to the people running the auction, and so they know that if you bid and if you ultimately win the option for the highest bid on something, you're going to pay. The sale's going to be completed. In the context of the Internet and TV, there is no guarantee that when I go click in and say, I want to buy that necklace, or I call in and say, I want to buy that necklace,  my credit card could be declined. I could decide during the whole discussion that now I'm not really interested in that necklace. I could decide to close my web browser. My computer could go haywire and I lose it. So those first 10 people that call in, there's no guarantee that they're going to actually go through and complete a sale. So what does the auctioneer do? The auctioneer has three options. The auctioneer can say, OK, I'm going to take them all in order and I'm going to charge everyone's credit card, and that way I know that I have sold 10 items. And as soon as I have charged 10 credit cards, then I can reduce the available quantity to 40 and the auction continues. And ultimately you get down to zero. This goes on and the price drops because the auctioneer is trying to encourage people to buy at lower prices because everyone's going to end up buying at a lower price. And that's another unique problem in this area. When I call in and charge my credit card $100, well, if the falling price on the auction actually ends up at $5, then there has to be a refund or a release on my card or a new charge on my card at $5 as opposed to the $100. So that's one option for the auctioneer. The auctioneer can wait until a sale is completed before reducing the quantity. And so it reduces the quantity one by one as each credit card is charged. Well, Your Honors, imagine the time that that takes. The auctioneer, they're only 24 hours in a day and most of these auctions run 24 hours a day. And the auctioneer's desire is to go forward with as many auctions as possible during the day to put out as many products. And if they have to wait on the credit card being charged, that's going to slow it down. Now, what the auctioneer could do is the first 10 callers say, okay, all those are going to be good. So I'm going to keep accepting bids. So let's say 10 people call in. The auctioneer says, okay, I'm going to sell 10 products now. I'm going to keep taking calls and internet clicks. And let's say 100 people actually click in before they can complete the sale of 50. Well, all those people who click in or call in are expecting to get a necklace. Well, what's going to happen to the auctioneer's reputation if I happen to be number 78 and I clicked in and I thought I had bought this necklace at $5 or $100 or whatever it is. But the auctioneer is now in an oversold situation. Eventually, nobody's going to use that auction website any longer because the auctioneer is going to have a reputation that they sell products that they don't have. And then finally, the third option that the auctioneer could do is they could say, okay, I'm only going to count 10. I'm going to do it really slowly. And at some point, I'm going to get to zero showing on the available quantity. But I really have a bunch of products still left because I never completed the sales. So then they're in an undersold situation. And they have lots of inventory. Instead of having 100 necklaces and they thought they'd sell out of the 100 necklaces, now they actually have 25 or 30 still laying around that they're going to have to resell at a later auction. That's the inventive concept. That's the problem. And this, Your Honors, is unique. Unique to television and Internet. And it's also unique. And this is where the preemption issue, the preemption concern, comes into play. It's unique in terms of the fact that this is a very rare form of auction. A multiple same item reverse auction is a unique thing. You're well into your rebuttal time. I see that, Your Honor. And I'll reserve the rest of my time for rebuttal. Thank you. Mr. Turner? Good morning, Your Honors. May it please the court. The patented issue in this case is an abstract idea with no meaningful limitation on that idea. And we would ask that this court affirm the board's decision below finding the unpatentability. The focus of our analysis in this case are actually on the patentability. Our analysis in this case has been about the human mental processes that are apparent, that are described by this patent. And that's the way we've described the abstract idea. And we did that because the patent says that all of the concepts here can be carried out by a person. And during prosecution, when they originally filed these claims, the claims were originally written so that all of the elements, the use of these preliminary indicators, all of that, would have been carried out by what the patent calls a TV producer. And as the patent says, the TV producer could be a person. This concept that the use of preliminary indicators can be carried out entirely by human mental steps, this was something that ACN's expert, Dr. Weil, that he agreed with, that he mentioned in his declaration and that he agreed with during his deposition. And this is something that ACN's counsel even acknowledged before the board below. And, of course, there are a line of cases from this court and from the Supreme Court referring to human mental processes as being an abstract idea. And in this case, on this point, the only rebuttal that we've gotten from ACN on this point is that the claims literally recite a system for carrying out some of these steps, the use of preliminary indicators to decrement the number of available units. And our position is that the mere recitation of a system doesn't change the fact that the underlying concept is something that can be carried out by human mental steps. And the idea that reciting a system would somehow excuse or allow the claiming of human mental processes goes against what the courts have said in Mayo and in Alice, that this has to be more than just a draftsman's art. And in the opening portion of this argument, there was some discussion about, I guess, the scope of the abstract idea, whether it is just a reverse auction or whether it includes the claimed use of preliminary indicators. And it was discussed that maybe the scope of this abstract idea isn't the most critical question here. But what I would say is that we agree that it's important to identify the fundamental concepts that are wrapped up in the claims here. But the approach that ACN has proposed that would only address, let's say, the field of the invention or the preambles of the invention and essentially ignore the rest of the claim language or ignore the rest of the specification, that approach, there's no basis for a rule in that regard. And certainly that approach would then exclude any allegedly inventive concepts from a patent from being considered as part of the abstract idea. If you're only going to look at the field of the invention, you're only going to look at the preambles, then not only has this court not done that, and I think ACN's counsel mentioned the Bazcombe case, the Bazcombe case expressly said that some courts will include the detailed claim limitations in the abstract concept that they find. And in that particular case, this court said that it was a close call, but they weren't going to do it there. So I don't think there's any basis for saying there's some sort of rule that the nuances of the claims can't be considered in the abstract idea. Here, because they can be carried out by human mental steps, they are abstract, and that takes us through at least step one of the Alice inquiry. Once we've decided that there are abstract concepts here, if you agree with our position as we've laid out in our briefs that the use of preliminary indicators to decrement the number of items, if you agree with us that that is an abstract human mental process, then in this particular case that ends the inquiry because ACN has not pointed to any other aspect of the claimed invention here that would somehow grant some eligibility. So if the use of preliminary indicators is abstract, there really isn't that much more to discuss here. So I think in the end, if for some reason the abstract idea were not to include that use of preliminary indicators, we would agree, as Judge Torrenta pointed out, that the precise definition of the abstract idea here is not entirely critical because what we're talking about is being able to guess when a customer is going to buy an item. And as ACN's counsel just said, there is no guarantee that a customer is going to buy. And what they've described here is somewhat of this idea that preliminary indicators, which they've described as anything that indicates that a customer is actually going to buy, what they're describing here is a human auctioneer being able to just say, I think this customer is going to buy based on what I know about that customer. That concept is a human mental process that is abstract and cannot somehow confer eligibility on these claims. I do want to touch quickly on ACN mentioned the DDR case. They are trying to draw a comparison between the Internet-centric claims in that case and what's going on here. They mentioned it too. This patent describes televised auctions that are communicated by telephone as well as auctions that are performed over the Internet. The DDR holding is specifically about Internet-centric problems. That was, as you know, that was about website pop-up ads, and it dealt with problems that specifically relate to the Internet age. This is not the... Even more than that, to the physical and programming structure of the particular set of networks that make up the Internet. It's not just the Internet age, not just, you know, this is sort of about the Internet, but about the actual technical way the Internet works, whether you can put on a screen information from two different sources on the Internet. Yes, that's correct, Your Honor. I was shorthanding it a bit, but I agree with you. It's much more detailed than that. And certainly in this situation, that's not what we have here. It can be done online. That doesn't mean that the DDR holdings case somehow controls the outcome here. And let's see if... Anything else? The last thing I would say is that Your Honor mentioned the affirmative elements in this case. What we're talking about here at bottom is a business solution to a business problem. Can we sell enough items? Do we know that our customers are going to buy this product? In the end, those are business decisions that are made, guessing as to whether a customer is actually going to buy, and that doesn't confer patent eligibility here. Okay. Thank you, Mr. Jordan. Thank you. Mr. Jordan. Your Honors, I'm not aware of any law that says, merely because something may be performed in a human's mind, it's not patentable. If that were the law, then no business method would ever be patentable. Now, I understand that there is a push in some sectors to outlaw business method patents altogether. But that's a question for Congress and not a question for this Court. Can you give us an example of any cases where a method that was solely performable  Your Honor, I would have to go back and look, but I can't think of any off the top of my head. But that's never been the test. That is not mentioned in the Alice case, which is what now controls Section 101. Obviously, the way people used to do it and the way this patent was prosecuted, because it was pre-Alice, was whoever prosecuted the case added the element of it being conducted, the reverse option being conducted by a system. That's what the examiner required. The examiner even made a Section 101 rejection. But I'm not aware of any case that says every time a process, a method, can be performed in the human mind, it is per se patent ineligible. I'm not aware of a case that says that. Certainly, it's a consideration. But, Your Honors, if that were the black letter rule, then I submit to you, there would not be a single business method that would be upheld as patent eligible. Now, I think the Court here has an opportunity to do two things, and let me quickly say this. One, make it clear that you have to choose the right abstract idea first. I think you have to do that. And secondly, I think this is a perfect opportunity for this Court to determine whether or not the second step of Alice, the transformation test into something significantly more, is a question of law or a question of fact. Okay. Thank you, Mr. Jones, for your time. Thank you, Your Honor. Thank both counsel. The case is submitted. That concludes our session for today. All rise.